No. 82-156

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

———————————

DENNIS WINKEL,

Plaintiff and Appellant,

vs.

FAMILY HEALTH CARE, P.C. and
LOREN VRANISH,

Defendant and Respondent.

———————————

Appeal from:  District Court of the Eleventh Judicial District,
              In and for the County of Flathead
              Honorable Robert Sykes, Judge presiding.

Counsel of Record:

    For Appellant:

        Warden, Christiansen, Johnson & Berg, Kalispell, Montana
        Kratten, Muchin, Zavis, Pearl & Galler, Chicago, Illinois
        Floyd A.Mandell argued, Chicago, Illinois

    For Respondents:

        Murphy, Robinson, Heckathorn and Phillips, Kalispell,
        Montana
        I. James Heckathorn argued, Kalispell, Montana

———————————

                        Submitted:   May 12, 1983

                        Decided:     July 12, 1983

Filed JUL 1 2 1983


_____
              Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Dennis Winkel filed a complaint May 4, 1979, seeking an accounting of profits, damages and injunctive relief based upon six causes of action arising from his employment with Family Health Care. Family Health Care counter-claimed for unfair and deceptive trade practices and malicious prosecution. A jury trial commenced in the District Court of the Eleventh Judicial District, Flathead County, on November 16, 1979. On November 19, 1979, the jury rendered a special verdict for Winkel, finding him entitled to a bonus of $30,942.41 and vacation pay of $3,000. The District Court entered judgment against Family Health Care and Vranish in the amount of $33,942.41, plus $33,942.41, in accordance with section 39-3-206, MCA, and reasonable attorney's fees.

On December 4, 1981, Vranish filed alternative motions for judgment for defendant notwithstanding the verdict, for a new trial and to alter and amend the judgment. On January 19, 1982, the District Court entered a memorandum opinion agreeing with the jury that Winkel was entitled to a bonus and vacation pay, but disagreeing with the jury as to the amount of the bonus. Further, the District Court failed to apply the statutory penalties for unpaid wages and attorney's fees. The order also stated that, should Winkel fail to accept the "modified" judgment, Vranish would be entitled to a new trial. Winkel appeals.

Dennis Winkel entered into an employment contract with Loren Vranish, a doctor practicing in Flathead County. The terms of the contract, as set forth in a letter dated February 15, 1977, were as follows:

(1) Annual salary of $26,000 to be computed as follows:

| | |
|---|---|
| 1st 4 months | $1,800/month |
| 2nd 4 months | $2,200/month |
| 3rd 4 months | $2,500/month |

(2) Hospitalization and malpractice insurance coverage;

(3) Three weeks vacation per year;

(4) Option for full partnership after one year of salaried employment.

Winkel commenced working for Vranish in July 1977. At that time Dr. Max Quaas was also working for Vranish.

In August 1977, Vranish incorporated his medical practice under the name of Family Health Care, P.C. Vranish was the president and sole shareholder of the corporation. At the same time, Vranish conveyed his office building to his wife, who began charging rent to the corporation.

In December 1977, Dr. Quaas ended his employment with Family Health Care. Winkel's workload increased greatly after Dr. Quaas left, so Vranish increased Winkel's salary to $3,000/month, starting January 1, 1978. Winkel testified that in addition to the salary increase, the following incentives were offered in consideration of his continuing association with Family Health Care:

(1) a profit sharing bonus;

(2) a refund to Winkel of all funds contributed to Family Health Care's pension plan in the event that Winkel's employment was terminated;

(3) four weeks paid vacation per year; and

(4) a 50 percent interest in the office building to Winkel's wife.

It was Winkel's understanding that he would not be required to "buy in" to the corporation to receive these incentives. Vranish disagrees. When Winkel's salary increased in January 1978, Vranish told his CPA that he wanted to make Winkel a full and equal shareholder by August 1, 1978. Therefore, Vranish contends that the profit-sharing bonus and other incentives were contingent upon Winkel "buying in" to the corporation.

Negotiations commenced toward effectuating this "buy in," and in August 1978, the parties reached a temporary agreement. It

was determined that the book value of one-half the corporate stock, which was to be sold to Winkel, was $40,000. Winkel was offered a credit of $9,600, which represented a January 1 - July 31, 1978, bonus. The remainder, rounded off to $31,500, was to be paid as follows: (1) a cash payment of $15,500; and (2) $16,000 to be paid through a "salary differential" wherein Vranish's salary would be increased by $500/month for 16 months and Winkel's salary would be decreased by $500/month for 16 months. Winkel would thus receive a credit of $1,000/month toward the purchase price.

In December 1978, problems arose regarding the agreement. Winkel voiced dissatisfaction with provisions regarding stock transfer restrictions, buy-out options, and forced sale provisions which, Winkel contends, were applied unilaterally to Winkel in favor of Vranish. Negotiations drifted further apart until in February 1979, Vranish made a final offer. By a letter dated February 22, 1979, Vranish offered to sell the corporation to Winkel, and Vranish would thereafter work for Winkel at 60 percent of his billings. If Winkel found this to be unacceptable, Winkel's association with Family Health Care would be terminated on March 15, 1979. In the letter Vranish also offered to pay Winkel for one month's vacation and $9,600. The $9,600 was later determined to be the amount of profit-sharing bonus Winkle would have accumulated from January 1, 1978 to July 31, 1978. Vranish testified at trial that $9,600 was not "owed" to Winkel, as was stated in the letter. However, he offered to pay the $9,600 to "avoid hassles."

Winkel did not accept Vranish's offer to buy the corporation, and on March 5, 1979, Vranish's attorney wrote a letter to Winkel's attorney requesting that Winkel "leave the employ of Family Health Care, P.C., on or before March 15, 1979." Thereafter, the working relations at Family Health Care became difficult. Winkel was "on call" the weekend before Thursday, March 15, but he refused to see any of Vranish's patients.

Vranish described Winkel's mood as "surly" when he came to work on Monday. Therefore, Vranish had the receptionist cancel Winkel's appointments. Winkel's patients were given the option of seeing Vranish or waiting to see Winkel when he opened his new office.

Winkel did not receive the vacation pay nor the $9,600 which Vranish offered to pay in his February 22, 1979, letter. At trial, Winkel testified that his contractual damages amounted to $35,000. The jury found that Winkel was entitled to vacation pay of $3,000 and a profit-sharing bonus of $30,942.41.

In a post-judgment order, the District Court amended the judgment by decreasing the bonus award to $9,600. The court stated:

> "By reason of the fact that this was the only bonus considered in the negotiations between the parties and was to apply on the buy-in agreement, negotiations limited the amount due Plaintiff to the sum of $9,607.51. The Defendant Family Health Care acknowledged this amount by reason of negotiations between the two as a basis of part of the Plaintiff's purchase. At time of termination, the defendant acknowledged same and offered terms for payment. Plaintiff agreed to this amount, but claimed a continual bonus as part of salary; and that same was a continuing basis for employment."

Four issues are on appeal. Vranish argues the underlying issue for purposes of review is whether the original written employment contract was amended as a matter of law.

Vranish contends Winkel is only entitled to recover the amount of vacation pay owing at the time of Winkel's termination. He argues Winkel is not entitled to any profit-sharing bonus because the original written employment contract did not provide for profit-sharing bonus and the written employment contract was never amended as a matter of law.

A contract in writing may be altered by a contract or by an executed oral agreement and not otherwise. Section 28-2-1602, MCA. An oral agreement altering a written agreement is not an executed oral agreement within the statute authorizing modification of written contracts by an executed oral agreement unless

its terms have been fully performed, and performance on one side is not sufficient. Stoddard v. Gookin (1981), _____ Mont. _____, 625 P.2d 529, 534, 38 St.Rep. 326. An executed contract is one where nothing remains to be done by either party. An executory contract is one in which a party binds himself to do or not to do a particular thing in the future. Bauer v. Monroe (1945), 117 Mont. 306, 316, 158 P.2d 485, 490.

For Winkel to be entitled to any profit-sharing bonus, we must find the written employment agreement was altered by an executed oral agreement. Winkel testified in December 1977, he and Vranish reached an oral agreement that Winkel would receive a profit-sharing bonus. Thus the question becomes, was this oral agreement executed, i.e., fully performed by both parties. The answer comes from Winkel's own testimony:

> "Q. And you went to work under the agreement that has been submitted in evidence which was the letter from Dr. Quaas to you explaining what your salary would be, is that correct? A. [Winkel] Yes.
>
> "Q. And that agreement then as far as any writing is concerned has never changed, isn't that correct? Anything other than that has been by word of mouth, been oral? A. Yes.
>
> "Q. And the only change that was made and has been completely done, completely executed was the fact that your salary was raised to $3,000 rather than twenty-two or some figure? A. Yes.
>
> "Q. And your testimony is that there was promises made to you that something else would be done but they have never been put into effect, have they? They have never been completed? You have never gotten anything out of those? A. That is correct."

From this testimony we see, as a matter of law, the oral agreement concerning profit-sharing bonus was never performed, thus the oral agreement was not executed. We find Winkel was not entitled to any profit-sharing bonus when Vranish terminated Winkel's employment. Therefore, jury instruction no. 11, allowing the jury to find Winkel was entitled to a bonus, was reversible error and Vranish is entitled to a new trial on the issue of accumulated vacation time owing at Winkel's termination.

Judgment granting new trial is affirmed. Counter-claim is denied and dismissed.

_John Conway Harrison_
Justice

We concur:

_Frank I. Haswell_
Chief Justice

_L. C. Gulbrandson_
Justices

_R. C. McDonough_
The Honorable R.C. McDonough,
District Judge, sitting in
place of the Honorable Frank
B. Morrison, Jr.

- 7 -

Mr. Justice John C. Sheehy, dissenting:

I dissent.

The opinions issuing from this Court get "curiouser and curiouser." For example, Vranish cross-appealed in this case. You will read the majority opinion in vain to discover that. Winkel raised four issues on his appeal from the District Court's amended judgment. The majority fails to mention what they are or discuss them. I am not going to discuss them in dissent because I think Winkel is entitled to a rehearing in this case. If I should discuss them, it might be concluded that the majority had considered Winkel's issues so as to deny rehearing under Rule 34, M.R.App.Civ.P. I will discuss them in depth if this Court denies rehearing.

I will, however, discuss the single ground on which the majority set aside the jury verdict, the holding that Winkel cannot recover because his claim is based on an oral amendment of a written contract.

This is not a case of an oral amendment to a written contract. The only written contract in this case arises from a letter dated February 15, 1977, from a Dr. Quaas, writing on behalf of Vranish. Under that agreement, Winkel would work for a set salary, and after one year he would enter into a partnership including Winkel, Vranish and Quaas. Winkel, under the letter, would be employed by Vranish. This agreement for eventual partnership was never carried out.

Instead, Winkel came to work for Vranish on July 1, 1977. On August 1, 1977, Vranish incorporated himself into Family Health Care, and from that date on Winkel worked for the corporation and not for Vranish. Quaas left the group

-8-

in November of 1977 (he also was an employee of the corporation when he left). When the February 15, 1977, letter for partnership was written, Vranish owned the building he practiced in and charged no rent to himself. At the time of the incorporation, he transferred the building to his wife, who charged the corporation rental prospectively and retrospectively. Before August 1, 1977, any profit produced by Winkel over his salary went to Vranish personally. After August 1, 1977, such profit from Winkel's production went to the professional corporation.

It defies common sense, and the law as I understand it, to hold that an implied contract of employment by a new entity is merely an oral amendment of a written contract of employment by a former completely different entity. Vranish is a legal entity; his professional corporation is legally a completely separate legal entity. When Vranish ceased to hire Winkel personally, the written contract under the partnership letter expired. When Winkel's employment transferred to the corporation, he began a new employment experience with a new employer. Winkel's employment by Vranish cannot be integrated with his employment by the corporation, so as to consider his new employment simply an oral amendment of a former written contract. The parties are not the same. After August 1, 1977, Winkel was working under a completely different contract, an oral contract based on new promises. Vranish was not his employer, but a co-employee of the same corporation. Winkel's cause of action on a contract basis in this action is against the corporation and not against Vranish.

Here, the jury decided that Winkel was deprived of a

share of the _corporation's_ profits due him under his oral contract of employment by the corporation. The majority brush aside that decision by an incorrect conception of the issues here. I would at the least reinstate the jury verdict against the corporation.

The facts of this case show a valid oral abrogation of a written contract and the substitution of an enforceable oral contract. We should follow the lead of California in such case and ignore the provisions of section 28-2-1602, MCA, that a written contract may be altered only by a contract in writing as not applicable. See, Pearsall v. Henry (1908), 153 Cal.314, 325, 95 P. 154, 157; Klein Norton Co. v. Cohen (1930), 107 Cal.App. 325, 330, 290 P. 613, 616.

Not thought of, certainly not discussed, by the majority is the true impact of section 28-2-1602, MCA, and its interpretation by this Court is Dalakow v. Geery (1957), 132 Mont. 457, 318 P.2d 253.

Recognize first that section 28-2-1602, MCA, is not a part of the statute of frauds, which we have in statute form in section 28-2-903, MCA. The provision that a written contract may only be altered by another written contract, section 28-2-1602, was "borrowed from the law governing sealed instruments, and now generally relaxed even as to them," in the words of Williston, who calls it an "unfortunate legislative adoption for written contracts." 15 Williston on Contracts (3rd Ed.) 495, fn. 6, section 1828.

California, through then Justice Traynor, moved away from a harsh interpretation of its counterpart to section 28-2-1602. The basis of distinction was additional consideration for the oral modification. Here, Winkel took over

a large share of the practice when Quaas left the employment of the corporation, a valid consideration. In such case, California held in D.L. Godbey and Sons Const. Co. v. Deane (1952), 246 P.2d 946:

> "Section 1698 of the Civil Code provides: 'A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise.' . . .
>
> "Section 1698 has a dual operation. On the one hand it invalidates oral contracts of modification that are unexecuted, and on the other hand, it validates executed agreements that might otherwise fail for lack of consideration. . . .
>
> "The situation is different, however, where there is consideration for the oral modification agreement. In such cases the rights and duties of both parties to the written contract are affected, and by performing the contract as modified each party will be in a position to execute the oral agreement on his side. . . Since plaintiff has alleged an adequate consideration for the oral modification and full performance on its part under the terms thereof, it has stated a cause of action."

This Court followed the lead of the California Godbey case in Dalakow, supra, saying we would interpret section 28-2-1602 as did California since we adopted that statute from California. In Dalakow this Court found that one of the parties to a contract orally agreed to do something he was not bound to do under the written contract, and this sufficed as consideration for an oral modification of the written contract. 132 Mont. at 466-467, 318 P.2d at 258-259. The salutary rule of Dalakow interpreting section 28-2-1602 has by implication been overruled by this decision, without a breath of discussion. Henceforth all written contracts in Montana will be given the force of sealed instruments. I regard that result regressive.

_____
                                    Justice

-11-

I concur in the foregoing dissent of Mr. Justice Sheehy.

_____
Justice

Mr. Justice Daniel J. Shea will file a written dissent later.